Ellen RAKESTRAW, Plaintiff-Respondent,

v.

Wilbur O. NORRIS, Defendant-Appellant.

No. 9170.

Missouri Court of Appeals,
Springfield District.

March 10, 1972.

E. C. Curtis, Farrington, Curtis & Strong, Springfield, for defendant-appellant.

Harold L. Henry, West Plains, for plaintiff-respondent.

HOGAN, Judge.

This is an action to recover damages for personal injuries sustained in an automobile collision. Plaintiff and her husband, Otis Rakestraw, filed their petition in two counts. In the first count, plaintiff Ellen Rakestraw sought judgment in the amount of $15,000 for personal injuries; in the second count, Otis Rakestraw sought to recover the sum of $7,500 for loss of services and consortium. On trial both counts were submitted to the jury, which returned a verdict in favor of plaintiff Ellen in the sum of $8,000 but made no finding whatever on plaintiff Otis' claim. Defendant appealed, but we were obliged to dismiss the appeal as premature because the judgment entered left one separate count pending and undisposed of. Rakestraw v. Norris, Mo.App., 469 S.W.2d 759, 761 [5]. On remand, plaintiff Otis dismissed his claim, a final judgment was entered, and the cause is again before us on defendant Norris' appeal.

Before the essential merits of this appeal can be determined, it is necessary to dispose of a preliminary question raised by the defendant with respect to the venue of the action. The collision in which plaintiff was injured occurred in Greene County. Plaintiff and the driver of the automobile in which she was riding, a Mr. Goodman, are residents of Howell County. Averring in her petition that Mr. Goodman had negligently " . . . operated his automobile at an excessive rate of speed under the conditions and circumstances then and there existing," that defendant had been negligent in several respects, and further alleging that she had been injured as a result of their "combined negligence," plaintiff joined both drivers as defendants and instituted her action in Howell County. Mr. Norris was served with process in Greene County, and it is upon the fact of Mr. Goodman's residence in Howell County that plaintiff sought and now seeks to

maintain that the venue of the action was appropriately laid. § 508.010, par. (2), RSMo (1969), V.A.M.S.[1] Sanders v. Marks, 228 Mo.App. 1079, 1085, 60 S.W.2d 692, 695 [4, 5]. Defendant does not question the general proposition that if he and Goodman were concurrently negligent in causing plaintiff's injuries they would be subject to a joint action and the venue would be proper, State ex rel. C. H. Atkinson Paving Co. v. Aronson, 345 Mo. 937, 941–942, 138 S.W.2d 1, 3 [4], and he grants that the plaintiff stated an actionable claim against both defendants. Defendant points out, however, that Mr. Goodman's wife was plaintiff's cousin, that both the Goodmans and plaintiff were residents of Howell County, that plaintiff dismissed as to Mr. Goodman before trial, and maintains that plaintiff's joinder of Mr. Goodman as a defendant was fraudulent and pretensive and was made solely for the purpose of establishing venue in Howell County. Flatly asserting that plaintiff never at any time had either the means or the intention of pressing her claim against Mr. Goodman, defendant urges that the trial court erred in denying his motion to quash service and dismiss the petition, made before the trial began but after a series of general appearances had been entered by the defendant. Plaintiff cites § 509.340 (now Rule 55.37), Jones v. Church, Mo.App., 252 S.W.2d 647, Lieffring v. Birt, Mo.App., 154 S.W.2d 597, and argues that defendant waived any right to object to the venue of the action or the trial court's jurisdiction over his person long before the motion was filed. In this connection, plaintiff points out that the motion was filed nearly two years after the action was instituted, subsequent to the entry of several general appearances by the defendant. She also notes that after the motion was denied defendant applied for and was granted a change of venue to the Circuit Court of Wright County, where the case was finally tried.

---

1. All references to statutes and rules are to RSMo (1969), V.A.M.S. and V.A.M.R., unless otherwise noted.

■ As to the plaintiff's claim of waiver, it is now well settled that a *timely* motion objecting to the venue of an action or the jurisdiction of the court over the person of a defendant preserves those objections throughout the trial, regardless of the fact that the defendant may thereafter plead over to the merits, utilize discovery procedures, apply for or consent to continuances, or apply for and obtain a change of venue. The objecting defendant need no longer, as some of the earlier cases indicated, either resort to prohibition or cringingly enter a "special appearance" and then suffer default to avoid waiver of the jurisdictional question. Rule 55.37; Greenwood v. Schnake, Mo., 396 S.W.2d 723, 725–726.[2] It is not so clear, from the present case law, when a motion made pursuant to Rule 55.31(a) is to be regarded as timely; in fact, the cases construing the time limitations contained in Rule 55.36 and the consolidation and waiver provisions of Rule 55.37 are in apparent conflict.[3] We have reached the conclusion that defendant's motion was untimely by any standard, but we decline to contribute to any further apparent conflict in the case law. Rather, we will consider the motion on its merits.

■ If it has not been fully articulated, the law on the subject of fraudulent and pretensive joinder under § 508.010, par. (2), is reasonably clear from the recent cases. Section 508.010, par. (2), provides that when there are several defendants and they reside in different counties, suit may be brought in any such county. The plaintiff must of course state a cause of action against the resident defendant in his petition, but the fact that he does so is not conclusive. A defendant is entitled to raise the issue of improper venue and lack of jurisdiction over his person by timely motion prior to the trial, and if, despite plaintiff's statement of a paper case against the resident defendant, it nevertheless appears to be clear from the records, pleadings and facts presented in support of the motion (if any) that the resident defendant cannot be held liable on any reasonable ground or theory and that plaintiff must be presumed to have known this, then the joinder cannot be considered justified and the cause should be dismissed. On the other hand, if it appears that plaintiff had reason honestly to believe on the facts that he had a joint cause of action against the resident defendant along with the others, and if he has stated a cause of action, the case should not be dismissed as based upon a fraudulent joinder. The objection that the venue is improper and jurisdiction of the person is lacking because of pretensive joinder should be presented by motion under Rule 55.31; the movant carries the burden of persuasion and the burden of proof if proof is necessary. The motion may be taken upon affidavits and counter-affidavits, or the court may hear evidence.[4] All that is necessary to justify joinder under § 508.010(2) is that plaintiff be entitled to an honest belief that under the law and the evidence he has a justiciable claim against the resident defendant. White v. Burkeybile, Mo., 386 S.W.2d 418, 425 [13]. The fact that plaintiff is related to Mrs. Goodman and that she instituted the action in the county in which both reside does not necessarily indicate a fraudulent joinder, Sanders v. Marks, supra, 228 Mo.App. at 1086, 60 S.W.2d at 695 [6], and the fact that plaintiff dismissed as to Mr. Goodman

---

2. See Divilbiss, "Special Appearances in Missouri," 27 Mo.L.Rev. 533, 537–540 (1962).

3. Compare Greenwood v. Schnake, supra, 396 S.W.2d at 726 [1–3] with Lee Holding Company v. Wentzville Oil Company, Mo.App., 409 S.W.2d 210, 213 [2], and Cockrell v. Farmers Mutual Automobile Ins. Co., Mo.App., 427 S.W.2d 303, 309 [4].

4. Glick v. Ballentine Produce Incorporated, Mo., 396 S.W.2d 609, 612 [1, 2]; Lichterman v. Crockett, Mo., 331 S.W.2d 607, 609–610 [1]; Frank v. Sinclair Refining Co., 363 Mo. 1054, 1061, 256 S.W.2d 793, 796–797; Hutchinson v. Steinke, Mo. App., 353 S.W.2d 137, 139 [1]; Diehr v. Carey, 238 Mo.App. 889, 899, 191 S.W. 2d 296, 301 [6].

before trial would not divest the Howell County Circuit Court of jurisdiction over defendant's person, if that jurisdiction was fairly acquired prior to the dismissal. Capital City Bank v. Knox, 47 Mo. 333, 334–336; January v. Rice, 33 Mo. 409, 411–412; Gray v. Grand River Coal & Coke Co., 175 Mo.App. 421, 423–424, 162 S.W. 277–278 [1].

In this court, the defendant relies heavily upon the testimony given by plaintiff and the Goodmans in two pretrial depositions, one taken April 13, 1967, and the other taken June 13, 1968. The whole of the second deposition is not before us, but one of the four supplements to the transcript filed indicates that it was before the trial court and was considered with the first deposition when evidence was heard on the motion to quash service and dismiss the petition on August 1, 1968. The defendant emphasizes in his brief that when plaintiff testified by deposition on June 13, 1968, she stated she did not believe Mr. Goodman was driving at an excessive speed just before the accident, that other automobiles were going faster than Mr. Goodman, and that Mr. Goodman must have been going about 30 or 35 miles an hour, "something like that, because we wasn't in no hurry." The speed limit at this point (on Glenstone Avenue) was 40 miles per hour. Defendant also calls attention to the fact that upon this last deposition plaintiff was asked, "Do you know of anyone who does know of anything that [Goodman] did to cause or anything that he failed to do to contribute to cause this accident," and plaintiff answered, "No, I sure don't."

 It may be granted that this testimony, taken in isolation, tends to support defendant's argument, but her appreciation of the legal significance of the facts available to her is not decisive. The record shows that the accident occurred on an arterial street while it was wet and at a time when traffic is usually heavy, and so, contrary to defendant's contention, the pretrial evidence that Mr. Goodman was driving

within the speed limit would not absolve him of negligently driving at an excessive rate of speed; driving at a speed which endangers persons or property in the circumstances may constitute negligence even though the particular rate of speed is within the limits of a statute or ordinance. Silvey v. Missouri Pacific Railroad Company, Mo., 445 S.W.2d 354, 362 [10]; Gerdel v. Broccard, Mo., 428 S.W.2d 492, 496. Moreover, we must consider the whole record—to the time the motion was heard, at least—to decide whether or not plaintiff was entitled to a reasonable belief that under the law and the evidence she had a justiciable claim against Mr. Goodman. Glick v. Ballentine Produce Incorporated, supra, 396 S.W.2d at 612.

In answer to interrogatories propounded to her by defendant on September 29, 1966, plaintiff stated that she was in possession of eleven photographs of the scene of the collision and the automobiles involved. One such photograph, introduced in evidence as plaintiff's exhibit 1, taken in conjunction with Mr. Goodman's pretrial testimony given on April 13, 1967, to the effect that he struck defendant's automobile without slowing his speed appreciably and that the impact took place "right in the middle of Glenstone," indicates that Mr. Goodman struck defendant's car with force sufficient to propel it on across Glenstone (approximately 33 feet) onto and over the curb at the northwest corner of the intersection, where it came to rest. This photograph also shows extensive damage to the Goodman vehicle and Mr. Goodman testified on pretrial deposition that the cost to repair his car would have been, in counsel's words, "about twice what it was worth."

 In answer to these same interrogatories, plaintiff stated that her attorney had had an investigator confer with the police officers who investigated the accident. Assuming, as we consider justified, that plaintiff was given the same facts as those to which the officer testified on trial, plaintiff knew that Mr. Goodman laid down skidmarks 40 feet long leading

directly to the point of impact. The answers to these interrogatories, though they are evasively and uncertainly worded, indicate that plaintiff may have had access to other information indicating that Mr. Goodman was driving at an excessive speed, but we need not extend the opinion by speculating upon all the facts available to plaintiff or her attorney prior to trial. The record does justify the conclusion that plaintiff or an attorney representing her knew that Goodman was driving on an arterial street during the rush hour at a time when the pavement was wet, that he skidded 40 feet before he struck defendant's vehicle without appreciably reducing his speed, and that the force of the impact was sufficient to demolish the Goodman car and propel the defendant's vehicle a considerable distance. Excessive speed may be proved by circumstantial evidence, and although neither skidding nor the heavy destructive effect of the impact is in itself proof of negligently high speed, either may indicate excessive speed taken with other circumstances. Greenwood v. Vanarsdall, Mo.App., 356 S.W.2d 109, 112 [3]; Union Bus Lines v. Moulder, Tex.Civ.App., 180 S.W.2d 509, 511 [3]; 11 Blashfield, Automobile Law and Practice, § 425.2, p. 471 (3rd ed. 1968). In the circumstances outlined above, we believe plaintiff was entitled to an honest belief that under the law and the evidence she had a justiciable claim against Mr. Goodman on her pleaded grounds of negligence, whether or not she personally appreciated the legal effect of the proof available to her. We hold that the joinder was not fraudulent or pretensive as claimed.

The defendant has briefed and argued two additional points, both of which deal with Instruction No. 3, plaintiff's verdict-directing instruction. The instruction reads:

"Your verdict must be for plaintiff, Ellen Rakestraw, if you believe:

First, defendant either:

violated the traffic signal, or failed to keep a careful lookout, and

Second, defendant's conduct, in any one or more of the respects submitted in paragraph First, was negligent, and

Third, as a direct result of such negligence, plaintiff, Ellen Rakestraw, sustained damage.

M.A.I. No. 17.02"

■ Defendant first complains that it was error to give Instruction No. 3 without defining the word "negligence," and further maintains that there was no evidentiary basis for the alternative submission that the defendant failed to keep a careful lookout. We shall consider these points in reverse order, because if the plaintiff made no submissible case, defects in the form of the verdict-directing instruction are immaterial. Howard v. Johnoff Restaurant Company, Mo., 312 S.W.2d 55, 56 [1]; Burks v. Buckmiller, Mo.App., 349 S.W.2d 409, 411 [1].

■ The instruction is an alternative or disjunctive submission of two grounds of liability, and of course there must be evidence to support both submissions or the giving of the instruction is error. Wolfe v. Harms, Mo., 413 S.W.2d 204, 209–210 [1]; Shelton v. Bruner, Mo. App., 449 S.W.2d 673, 676 [1]. The defendant does not question the submissibility of the first alternative ground—violating the traffic signal. It is the second alternative which he claims is without evidentiary support. Maintaining that "[i]t is academic that before a plaintiff may be entitled to a verdict on this [lookout] issue, there must be evidence in the case that the defendant could have seen the *plaintiff's automobile* [our emphasis] sooner than he did," and further that there must be substantial evidence that in the exercise of the highest degree of care defendant could have seen plaintiff's automobile in time to have taken effective precautionary action, defendant says the evidence established neither such requirement. Plaintiff accepts these general premises, but maintains that she made a submissible case; she calls

attention to the general rule that in determining the submissibility of her case she is entitled to a construction of the evidence most favorable to her submitted theory, as indeed she is. Welch v. Sheley, Mo., 443 S.W.2d 110, 118 [6]; Shelton v. Bruner, supra, 449 S.W.2d at 676 [1].

This accident occurred at the intersection of Glenstone and Bennett Streets in the City of Springfield about 5:45 P.M. on May 11, 1966. It had been raining and the streets were wet. Plaintiff was riding in the Goodman automobile, which was traveling north on Glenstone. Defendant was traveling west on Bennett. Both streets are wide, heavily traveled streets. At the point of collision, Glenstone, which runs north and south, is 66 feet wide, and Bennett, which runs east and west, is 40 feet wide. According to a Mr. Alexander, an employee of the State Highway Department, there were at that time three lanes for northbound traffic on the east side of Glenstone, one inside lane for left-turning traffic and two outer lanes for traffic going through at that point. On Bennett, westbound, there were two lanes, one inner or "storage" lane for left-turning traffic and one for westbound traffic going through. The intersection was controlled by electric signals, presumably lawfully erected and functioning properly on the occasion in question.

Plaintiff was riding in the rear seat of the Goodman vehicle. Mr. Goodman was driving, and Mrs. Goodman was seated to his right in the front seat. Shortly before the accident, and perhaps at the time of the collision, plaintiff was engaged in conversation with Mrs. Goodman, who is her cousin. Plaintiff testified positively, however, that as she approached the intersection she saw the electric signal, "one directly overhead," "seen it as I got there," and that the signal was green for northbound traffic on Glenstone. Plaintiff further stated that as the Goodman car went through the intersection " . . . I saw this white car coming through, it was going so fast I couldn't say anything."

The "white car" came from plaintiff's right, but she didn't know what direction "right" was at that point. In the course of a vigorous and extended cross-examination it was shown that plaintiff had made contradictory statements in pretrial depositions, but of course the jury was at liberty to accept plaintiff's trial testimony and reject any contradictory statement made in a pretrial deposition. Moore v. Ready Mixed Concrete Company, Mo., 329 S.W.2d 14, 20 [2, 3]; Hamilton v. Patton Creamery Co., 359 Mo. 526, 534, 222 S.W.2d 713, 716 [1–3]; Reeves v. Thompson, 357 Mo. 847, 855, 211 S.W.2d 23, 28 [7].

Plaintiff also had evidence from Mr. Goodman. He testified that he had driven from Willow Springs, Missouri, to Springfield, arriving in Springfield about 5:45 P.M. As he approached the intersection where the accident occurred, he was driving "approximately thirty or thirty-five miles an hour," "moving with the traffic." "About the center of the block" before he reached the intersection, Mr. Goodman saw the electric signal. When he first saw the signal it was red, but "it had turned green when I got to the intersection." As Mr. Goodman entered the area of intersection "there were cars ahead of me [which] went on through the intersection. One car that was in the right-hand lane behind me . . . swerved out and went around and the car that was behind me had stopped, then after the impact he had pulled out and went on around me." The cars "that were in front," that is, the ones which moved north on Glenstone through the intersection before the collision, were, Mr. Goodman "would say," twenty or twenty-five feet ahead of him. In describing how the accident happened, Mr. Goodman testified that "to the best of my recollection when I come up to the intersection and started through the [other] car moved across in front of me from the right and I hit it, I didn't have time to apply my brakes or anything." The collision occurred "just right in the center part of the intersection," and Mr. Goodman did not

see the other automobile "until just a second before . . . the collision." The vehicle which he struck came from Mr. Goodman's right. Just prior to the collision there was another automobile on Bennett Street, in the "left hand" or "storage" lane, indicating that it was going to turn left onto Glenstone. After the impact, the vehicle Mr. Goodman struck went on across the intersection (to the west) and stopped. It was defendant's vehicle.

On cross-examination, again vigorous and detailed, Mr. Goodman repeated, in substance, what he had said on direct examination. As with the plaintiff, it was shown that Mr. Goodman's trial testimony was not altogether consistent with statements he had made in pretrial depositions, or that he could not remember what he had said. Mr. Goodman was recalled, we notice, and was asked specifically "the color of the light as you went through the intersection." Mr. Goodman answered, "As I entered the intersection the light was still green."

Defendant's version of the facts, as here material, was that he had been "cleaning up after the carpenters" who were building a new home for him. He was hungry and on the way home to his evening meal. In order to get home, it was necessary for him to drive west across Glenstone. When defendant came to the intersection, the light was red for traffic westbound on Bennett. Defendant stopped. There were no other vehicles ahead of him in his lane, and according to his testimony there were none in the "storage" lane to his left. Defendant sat and waited for the light to turn. It turned green, defendant, "looked, everything was clear [and] I drove on across." As he drove into the intersection, defendant testified, "nothing was moving, everything was stopped." The intersection was completely clear when the defendant moved into it. According to Mr. Norris, "[a] car coming from the south evidently didn't see the red light," and struck his vehicle in the left side.

On cross-examination, Mr. Norris stated that he was wearing his glasses, and in effect reiterated that *all* traffic on Glenstone had completely stopped when he moved into the intersection. Defendant's testimony was that he was moving slowly and could have stopped his car in "five feet or so, I suppose." Mr. Norris first saw the other car—Mr. Goodman's vehicle—when it struck him. Defendant had evidence from other witnesses which, as material here, indicated that it was Mr. Goodman, not the defendant, who violated the traffic signal.

Specifically, and to reiterate, defendant's sufficiency point, as amplified in his brief, is that there is no scintilla of evidence showing that he could have seen Goodman approaching from the south on Glenstone in time to take effective precautionary action. There was no evidence, he argues, showing when the Goodman vehicle was or should have become visible, and therefore it is impossible to say that he could and should have seen the Goodman vehicle in time to have avoided the accident.

Defendant's argument has considerable force if one accepts his premise that defendant's whole duty was to keep a careful lookout for the Goodman vehicle as he entered the intersection, and the further assumption that the lookout submission was meant and understood as submitting defendant's failure to maintain a lookout for other traffic approaching so closely as to constitute an immediate hazard. The defendant's duty was not so narrow, however, and the alternate submission, taken literally from M.A.I. 17.05, did not specify the object which defendant failed to see. The whole substance of plaintiff's case was, and her evidence tended to show, that defendant failed to obey an electric traffic signal and proceeded into an intersection already occupied by lawfully moving traffic. Plaintiff was not in a position to prove, nor do we believe she was required to prove, in the specified circumstances, whether the defendant saw the stop light and failed to obey it, or whether defendant

simply failed to look for and discover the signal as he approached the intersection. Her proof was entirely consistent with either alternative.

■■■■■ The difficulty with defendant's legal position is that his duty to maintain a lookout was a continuous duty, and he was charged with seeing what one in the exercise of the highest degree of care for himself and others could and should have seen in similar circumstances. Braun v. Hoffmeister, Mo., 366 S.W.2d 406, 408–409 [2–4]; Hildreth v. Key, Mo.App., 341 S.W.2d 601, 606 [3]. In our view, as related to the present appeal, defendant's duty included the obligation to maintain a lookout for and be observant of electric signals installed to minimize the dangers inherent at street intersections. As recently stated in Miller v. St. Louis Public Service Company, Mo., 389 S.W.2d 769, 771 [2], "[t]he object and purpose of the strict requirement that persons operating motor vehicles keep a proper lookout upon public streets and highways is that they may acquire knowledge of the presence of other persons *and objects* [our emphasis] on such streets and highways, and an awareness of dangerous situations and conditions. It is only because of that knowledge and awareness that the operators of motor vehicles may take appropriate precautionary measures to avoid injury to themselves and other persons within an existing area of peril." The general rule is that "[i]t is the duty of a driver approaching or entering an intersection to watch for and observe traffic lights or signals . . . [s]o motorists must be on the lookout for such warnings and have their vehicles under such management and control as will enable them promptly to obey the signals as given." 60A C.J.S. Motor Vehicles § 360(1), p. 536, and see 3 Blashfield, Automobile Law and Practice, § 114.41, p. 89 (3rd ed. 1965). If our Supreme Court has never directly held that electric signals are among the objects for which a motorist must maintain a proper lookout, it has at least inferentially so held, see Harrell v. Berberich, 359 Mo. 551, 556, 222 S.W.2d 733, 735 [3–5], and there are many rulings from other jurisdictions which support this conclusion.[5]

■■■■■ In this case, despite the complexity of some of the evidence presented by the defendant, the sole substantive issue developed on trial was whether Mr. Goodman or defendant ran the stop light. The jury was at liberty to believe all of the testimony of any witness or none of it, or accept it in part and reject it in part, just as it found it to be true or false when considered in relation to the other testimony and the facts and circumstances in the case. Capriglione v. Southwestern Bell Telephone Co., Mo., 376 S.W.2d 205, 206 [2]; Kickham v. Carter, Mo., 314 S.W.2d 902, 905 [1]. In the circumstances detailed above, a jury could reasonably have found that the defendant did not maintain a careful lookout for the electric signal controlling traffic westbound on Bennett, but instead moved into the intersection at a time when the signal was adverse to him and while the intersection was already occupied by traffic lawfully moving north on Glenstone. We therefore believe and hold that the evidence was sufficient to justify plaintiff's submission that the defendant failed to keep a careful lookout. It is true, as defendant maintains, that the lookout submission presupposes time and space in which to take effective precautionary action after the defendant's duty to act arises, Zalle v. Underwood, Mo., 372 S.W. 2d 98, 102 [2], [3]; Shelton v. Bruner, supra, 449 S.W.2d at 679 [3], but in this case the jury was at liberty to find that in the maintenance of a careful lookout the defendant, in the exercise of the highest degree of care, could have discovered an adverse electric signal in time thereafter to

5. See, e. g., Christensen v. Hennepin Transp. Co., 215 Minn. 394, 10 N.W.2d 406, 410 [2]; Rogers v. Brown, 129 Neb. 9, 260 N.W. 794, 797 [5]; White v. Cothran, 260 N.C. 510, 133 S.E.2d 132, 134–135 [3, 4]; Zandras v. Moffett, 286 Pa. 477, 133 A. 817, 818 [5].

have stopped short of the intersection and remain stopped until the signal was favorable. The point that in any reasonable view of the evidence defendant did not have time or the means to avoid the collision is without merit.

The defendant's final point is that the words "negligent" and "negligence" as used in Instruction No. 3 should have been defined for the jury. In light of the generality of plaintiff's alternative submission—failure to keep a careful lookout—we believe the point is well taken. We realize that it is not an M.A.I. requirement that a definition of the word negligence be given whenever that term appears in the instructions, Brewer v. Swift & Company, Mo., 451 S.W.2d 131, 134, and perhaps if plaintiff had submitted her case solely upon a violation of the traffic signal, such definition would have been unnecessary. However, there is no specific statutory duty to maintain a careful lookout in this state, except as that duty inheres in the requirement that "[e]very person operating a motor vehicle on the highways of this state shall drive the vehicle in a careful and prudent manner . . . and shall exercise the highest degree of care." § 304.010, par. 1. "Keeping a careful lookout" does not in itself denote the exercise of a specific standard of care; it is a term of variable meaning, depending upon the context in which it is used.[6] In this particular case, the defendant was required to exercise the highest degree of care in the maintenance of a lookout to discover the presence of other persons and objects on the streets and to become aware of dangerous situations and conditions there existing, Miller v. St. Louis Public Service Company, supra, 389 S.W.2d at 771 [2], but the jury was given no standard by which to measure his duty because the terms "negligent" and "negligence" were not defined. As stated, because of the broad generality of the lookout submission, it is our opinion that the terms "negligent" and "negligence" should have been defined, and that plaintiff's failure to define those terms was prejudicial to the defendant. Helfrick v. Taylor, supra, 440 S.W.2d at 945 [5]; and see Zipp v. Gasen's Drug Stores, Inc., Mo., 449 S.W.2d 612, 618 [5].

For the error just noted, the judgment is reversed and the cause is remanded, but since the defendant has not complained in this court that the verdict is excessive, that the evidence of permanent injury is not substantial, or that the instruction given on the measure of damages was erroneous or without evidentiary support, the issue of damages need not be retried, and the cause is remanded for a new trial upon the issue of liability only. If upon retrial the verdict be for the plaintiff, the trial court shall enter judgment for her in the sum of $8,000 against the defendant. Beckwith v. Standard Oil Company, Mo., 281 S.W.2d 852, 857 [11]; Thornton v. Vonallmon, Mo.App., 456 S.W.2d 795, 799 [8].

TITUS, C. J., and STONE, J., concur.

---

6. Helfrick v. Taylor, Mo., 440 S.W.2d 940, 944–945; Billingsley v. Westrac Company, D.C.Ark., 246 F.Supp. 356, 361 [5, 6], aff'd 8th Cir., 365 F.2d 619; Devore v. Schaffer, 245 Iowa 1017, 65 N.W.2d 553, 557 [3], [4], 51 A.L.R.2d 1041, 1047; Spackman v. Carson, 117 Utah 390, 216 P.2d 640, 643 [3].